# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re ) | Involuntary Chapter 7 Proceedings |
| ) | |
| **MEDPOINT MANAGEMENT, LLC**, an ) Arizona limited liability company, ) | Case No: 2:14-bk-15234-DPC |
| ) | **ORDER GRANTING MEDPOINT** |
| Purported Debtor. ) | **MANAGEMENT'S MOTION TO** |
| ) | **DISMISS** |
| ) | |
| ) | |

Mike Danzer, 7511 IRA Investments, LLC, Jason Jensen, and Robert Brown (collectively "Petitioning Creditors") filed an involuntary chapter 7 petition ("Petition") against Medpoint Management, LLC ("Medpoint") on October 7, 2014 (DE 1).[1] Medpoint filed a Motion to Dismiss or for Abstention ("Motion") on December 31, 2014, and requested a hearing on damages (DE 34). Petitioning Creditors responded on January 14, 2015 (DE 37) ("Response"), and Medpoint replied ("Reply") (DE 42). The Court heard oral argument on the Motion on January 29, 2015 (DE 45). At the hearing, the Court requested additional briefing on the potential forfeitability of Medpoint's assets under the Controlled Substance Act ("CSA").[2] Petitioning Creditors filed their Supplemental Opposition ("Opposition") (DE 48), and Medpoint filed its Legal Memorandum ("Memorandum") (DE 47) on February 17, 2015. The parties filed simultaneous responses on February 24, 2015. The Court heard oral argument on the supplemental pleadings on March 4, 2015 (DE 52), after which it took the Motion under advisement. The Court now grants the Motion in part and dismisses the Petition.[3]

---
[1] The Court has jurisdiction over this matter under 11 U.S.C. §§ 157 and 1334.
[2] The CSA is codified in 21 U.S.C. § 801, et seq.
[3] The Court denies Medpoint's request to set a hearing on damages.

**Background**

### *1. ANW's Relationship with Medpoint*

Arizona Nature's Wellness ("ANW") is an Arizona nonprofit entity which holds an Arizona Department of Health Services-issued Dispensary Certificate ("Certificate"). The Certificate allows ANW to operate the "Bloom"-branded medical marijuana dispensary ("Dispensary") under the Arizona Medical Marijuana Act ("AMMA"), codified in A.R.S. §§ 36-2801–2819. AMMA requires that all state-registered dispensaries "be operated on a not-for-profit basis," and that dispensaries' bylaws "contain such provisions relative to the disposition of revenues and receipts to establish and maintain [their] nonprofit character." A.R.S. § 36-2806(A). This requirement has resulted in a proliferation of dispensary-management entities which serve as repositories of dispensary revenues, while dispensaries maintain their nonprofit nature.

Medpoint is (or was) such an entity. Medpoint is an Arizona limited liability company with two members, Ask Nice Twice, LLC ("ANT"), and Here Is Now, LLC ("HIN"). ANT is the manager of Medpoint. Yuri Downing ("Downing") is the 100% owner of both ANT and HIN, and is Medpoint's statutory agent.

Medpoint formerly managed ANW's marijuana business, business relationships and cultivation operations. Medpoint first came into contact with ANW when Medpoint purchased a 100% membership interest in Tier Management, LLC ("Tier") from Petitioning Creditor Mike Danzer ("Danzer") on January 3, 2013 ("Danzer Sale Agreement"). *See* Motion at Ex. G: Danzer Sale Agreement (DE 34-7). Medpoint acquired Danzer's Tier interest because on January 2, 2013, Tier had entered into a Cultivation and Dispensary Services Agreement with ANW ("Tier Service Agreement"). *See* Motion at Ex. A: Tier Service Agreement (DE 34-1). Medpoint purchased the Tier interest in order to acquire the Tier Service Agreement. *See* Response at Ex. A:

Downing Depo., at 27:25–29:17 (DE 37). ANW needed a management entity to partner with because, for example, ANW had no employees.[4]

Under the terms of the Danzer Sale Agreement, Tier, now controlled by Medpoint, continued servicing ANW under the terms of the Tier Service Agreement. *See* Motion at Ex. G: Danzer Sale Agreement, at ¶¶ 2.1.13, 2.1.15 (DE 34-7). Medpoint, through Tier, continued servicing ANW under the Tier Service Agreement until December 11, 2013, when Medpoint signed a separate Cultivation and Dispensary Services Agreement ("Medpoint Service Agreement") with ANW. The Medpoint Service Agreement superseded the Tier Service Agreement. *See* Opposition at Ex. A: Medpoint Service Agreement, at ¶ 29 (DE 48). ANW terminated the Medpoint Service Agreement on May 27, 2014, alleging dissatisfaction with Medpoint's performance under the Medpoint Service Agreement. This is somewhat puzzling, because ANW was a captive entity under the terms of the Medpoint Service Agreement, which Agreement allowed Medpoint to appoint ANW's board. Reply at 3:16–20 (DE 42).[5] Medpoint is not currently performing any management services for ANW or any other entity. Motion at ¶ 15 (DE 34). ANW now contracts for dispensary and cultivation management services with Bloom Master Fund I, LLC ("BMF").[6] Response at Ex. A: Downing Depo., at 57:22–25 (DE 37).[7]

### *2. Medpoint's Current Assets and Ties to Other Entities*

Medpoint owns the "Bloom" name and trademark ("IP") under which ANW sells its marijuana products. *See* Motion at Ex. B: Trade Name Registration (DE 34-2). Medpoint currently licenses the IP to Bloom IP Industries, LLC ("Bloom Industries") for

---

[4] *See* note 8, *infra*.
[5] The Court did not find such a provision in either the Medpoint Service Agreement or the Tier Service Agreement.
[6] The record contains no hard facts regarding the agreement between ANW and BMF. No written contract between BMF and ANW (if any exists) is attached to any of the pleadings. Downing is a current employee and former member of BMF.
[7] The Court attaches a diagram showing the various entities' relationships before and after ANW terminated the Medpoint Service Agreement.

$8,000 per month. *See* Motion at Ex. J: IP Licensing Agreement (DE 34-10).[8] This is Medpoint's only current source of revenue.

In addition to the IP and the revenue it generates, Medpoint's other assets include: (1) its 100% membership interest in Tier; and (2) its causes of action relating to ANW's alleged wrongful termination of the Medpoint Service Agreement.[9]

### *3. Petitioning Creditors' Claims against Medpoint*

The Petitioning Creditors consist of Danzer, 7511 IRA Investments, LLC ("7511"), Jason Jensen ("Jensen"), and Robert Brown ("Brown").

Danzer's claims against Medpoint arose from the Danzer Sale Agreement, by which Medpoint bought Danzer's 100% interest in Tier. Under the terms of the Danzer Sale Agreement, Medpoint paid Danzer $150,000 down, and signed a promissory note for two more payments of $150,000 each. *See* Motion at Ex. G: Danzer Sale Agreement (DE 34-7). Medpoint defaulted on the Danzer Sale Agreement. *See* Response at Ex. A: Downing Depo., at 45:25–46:2 (DE 37). Danzer also entered into a Consulting Agreement with Medpoint on January 3, 2013, whereby he would provide services relating to managing construction of a marijuana cultivation facility. *See* Motion at Ex. F: Danzer Consulting Agreement (DE 34-6). Medpoint never paid Danzer any of the $5,000 monthly fees due under the Consulting Agreement. Response at Ex. A: Downing Depo., at 47:9–48:6 (DE 37).

Jensen also signed a Consulting Agreement with Medpoint on January 3, 2013, whereby he would provide project management services relating to the grow house construction. *See* Motion at Ex. E: Jensen Consulting Agreement (DE 34-5). Medpoint

---

[8] Bloom Industries is a wholly-owned subsidiary of BMF, ANW's current management entity.

[9] Infinite Bloom, LLC was previously a wholly-owned Medpoint subsidiary. Medpoint sold Infinite Bloom to BMF for $11,100 on June 2, 2014. *See* Opposition at Ex. B: Asset Sale Agreement (DE 48). Infinite Bloom employed the 74 employees who performed Medpoint's management services for ANW. Medpoint sold Infinite Bloom to BMF "so that [BMF] wouldn't have to switch all the employee contracts and everything else . . . ." Response at Ex. A: Downing Depo., at 113:2–5 (DE 37).

never paid Jensen's monthly fees under the Consulting Agreement. Response at Ex. A: Downing Depo., at 50:20–51:3 (DE 37). The Consulting Agreement attached to the Motion does not reference medical marijuana, but the Court does not doubt that Jensen was aware of the nature of Medpoint's business.

On August 27, 2013, Robert Brown loaned Medpoint $100,000 ("Brown Loan"). *See* Motion at Ex. D: Brown Loan (DE 34-4). Medpoint has not repaid the Brown Loan. Response at Ex. A: Downing Depo., at 55:18–20 (DE 37). The first recital of the Brown Loan acknowledges that Medpoint is in the medical marijuana business.

On September 9, 2013, 7511 loaned Medpoint $400,000 ("7511 Loan"). *See* Motion at Ex. C: 7511 Loan (DE 34-3). Medpoint defaulted on the 7511 Loan. 7511 claims Medpoint owes it $400,000. The first recital of the 7511 Loan acknowledges that Medpoint is in the medical marijuana business.

**Issue**

The issue before this Court is whether it can or should enter an involuntary order for relief against Medpoint despite the fact that Medpoint's current and former business affairs are illegal under applicable federal criminal statutes. This question appears to be a matter of first impression in the District of Arizona. The Court finds that cause exists under section 707(a) to dismiss the Petition.[10]

**Medpoint's Arguments**

Medpoint argues that a bankruptcy trustee cannot lawfully administer a bankruptcy estate's marijuana-related assets without violating the CSA. *In re Arenas*, 514 B.R. 887, 891–892 (Bankr. D. Colo. 2014) ("For the Trustee to take possession and control of the Debtors' Property and marijuana inventory would directly involve him in the commission of federal crimes."). In *Arenas*, the court held that the inevitable illegality of the trustee's administration of illegal estate assets constituted cause to

---

[10] All section numbers refer to Title 11 of the United States Code unless stated otherwise.

dismiss under section 707(a). *Id.* Alternatively, Medpoint cites *Northbay* for the proposition that the Court must dismiss this case because Petitioning Creditors' hands are unclean due to their involvement in a medical marijuana enterprise. *Northbay Wellness Grp. v. Beyries*, 2012 WL 4120409 at *4 (N.D. Cal., Sept. 18, 2012) (affirming that unclean hands doctrine prevented bankruptcy court from granting relief to plaintiff medical marijuana business seeking a nondischargability determination, because it was engaged in activity which was illegal under federal law).

Lastly, Medpoint argues that the Court could alternatively suspend all proceedings under section 305(a). Medpoint argues that the conflict between state and federal law makes the bankruptcy court "the most inefficient and troublesome" forum. Motion at 13:11. Medpoint notes that Petitioning Creditors' claims are grounded in state law. *Id.* at 13:18.

**Petitioning Creditors' Arguments**

Petitioning Creditors deny that Medpoint is currently engaged in any illegal activity and deny that either the IP or the IP licensing revenues are forfeitable under the CSA. Petitioning Creditors distinguish Medpoint from the marijuana-related parties in the cases Medpoint cites, noting that those cases involved operating dispensaries or growers. Response at 4–6. Petitioning Creditors deny they have unclean hands, arguing that nothing in the record or Motion indicates that their claims "are in any way related to the actual proceeds of the sale of marijuana or ongoing illegal activity." *Id.* at 6:19–20. Petitioning Creditors deny that Medpoint used their funds to purchase marijuana or any other illegal substance. *Id.* at 6:23–24. Petitioning Creditors observe that Medpoint "applied for and received a Federal Tax ID number," and that Medpoint banked at Wells Fargo, an FDIC-insured bank. *Id.* at 7:8–11. As to Medpoint's section 305(a) argument, Petitioning Creditors urge that suspending all proceedings would not be in the best interests of creditors, citing the BAP's decision of *In re Eastman*, 188 B.R. 621, 624–

1  625 (9th Cir. BAP 1995) (under section 305(a), "the test is whether both the debtor and
2  the creditors would be 'better served' by a dismissal.").

3  Lastly, Petitioning Creditors argue that even though medical marijuana may be
4  technically illegal, with the passage of the Consolidated and Further Continuing
5  Appropriations Act ("Cromnibus Act"), there can be no federal enforcement actions
6  against Arizona medical marijuana businesses. The Cromnibus Act is significant
7  because it provides funding for the entire federal government through September 30,
8  2015. Section 538 of the Cromnibus Act states: "None of the funds made available in
9  this Act to the Department of Justice may be used, with respect to the state[] of . . .
10 Arizona . . . to prevent [Arizona] from implementing [its] own [law] that authorize[s] the
11 use, distribution, possession, or cultivation of medical marijuana." Cromnibus Act, Pub.
12 L. 113-235, § 538 (2014).

### The United States' Trustee's Position

At the January 29 hearing on the Motion, counsel for the United States Trustee ("UST") expressed concern and skepticism regarding a trustee's ability to administer a bankruptcy estate for Medpoint. ECRO audio file of Jan. 29, 2014 hearing (DE 46). Posing a hypothetical to the Court, she asked: "So, you're going to ask a trustee to look at a management contract for illegal activities, essentially. So what is that trustee going to do?" Counsel for the UST was not convinced that Medpoint had any legal, non-marijuana assets that a trustee could lawfully administer. Id. Medpoint affirms that all of its assets are marijuana-related. Memorandum at 4–6 (DE 47).

### Analysis

The Court analyzes three general arguments in reaching its decision on the Motion: (1) whether there is cause to dismiss the Petition; (2) whether Petitioning Creditors have unclean hands, and if they do, whether this Court can or should enter an

order for relief; and (3) whether Petitioning Creditors acted in bad faith in filing the Petition.

### 1. *Cause to Dismiss under Section 707(a)*

Under section 707(a), the Court may dismiss a chapter 7 case for cause after notice and a hearing. In *Arenas*, the bankruptcy court found cause to dismiss the debtor's case because the debtor's assets included marijuana and marijuana-related assets. *In re Arenas*, 514 B.R. 887, 892 (Bankr. D. Colo. 2014) ("The impossibility of lawfully administering the Debtors' bankruptcy estate under chapter 7 constitutes cause for dismissal of the Debtors' case under 11 U.S.C. § 707(a)."). The *Arenas* court held that "Debtors' chapter 7 trustee . . . [could not] take control of the Debtors' Property without himself violating §856(a)(2) of the CSA," nor "liquidate the inventory of marijuana plants Mr. Arenas possessed on the Petition Date" without violating §841(a) of the CSA. *Id.* at 891. Because the trustee was unable to perform his duties, the court found the bankruptcy case was futile.

In *Vel Rey*, the chapter 7 trustee wanted to operate the debtor's property to increase its sale value. *In re Vel Rey Properties, Inc.*, 174 B.R. 859 (Bankr. D. D.C. 1994). The trustee asked the bankruptcy court for immunity from liability for any noncompliance with D.C.'s housing regulations while he readied the property for sale. *Id.* at 863. The court denied the trustee's request, noting that if either the trustee or the United States Trustee refused to serve for "concern[] about personal liability . . . the court could simply dismiss the case for cause under § 707." *Id.* at 866 (citing *Ohio v. Commercial Oil Serv. Corp., Inc.*, 58 B.R. 311 (Bankr. N.D. Ohio 1986)).

In another District of Colorado bankruptcy case, the debtor-in-possession was a landlord who received approximately 25% of its revenue from a marijuana entity. *In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799, 802–803 (Bankr. D. Colo. 2012). The bankruptcy court found that renting to the marijuana entity exposed debtor to criminal

liability and forfeiture of the real property. *Id.* at 809. Because of the risks associated with the marijuana tenant, the bankruptcy court held that the debtor's continuing lease with the marijuana entity constituted "gross mismanagement of the estate" and was cause to dismiss under section 1112(b)(4)(B). *Id.* The Court is strongly persuaded by the reasoning in this line of cases.

The Court is also persuaded by the UST's argument that the appointment of a chapter 7 trustee would place that trustee in an untenable position. A trustee would have good reason to worry about his/her risk exposure relating to the administration of a marijuana-related entity's estate:

> Where the Bankruptcy Code has conferred special powers upon the trustee and where there was no common-law limitation on that power, Congress has expressly provided that the efforts of the trustee to marshal and distribute the assets of the estate must yield to governmental interest in public health and safety.

*Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 502, 106 S. Ct. 755, 760 (1986) (citing *Ohio v. Kovacs*, 469 U.S. 274, 105 S. Ct. 705, 766–767 (1985)). The first section of the CSA shows that Congress enacted it in its "governmental interest in public health and safety." In that section, Congress finds and declares: "The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect <u>on the health and general welfare of the American people</u>." CSA, 21 U.S.C. § 801(2) (emphasis added). Marijuana is a schedule-I controlled substance under the CSA. *See* CSA, 21 U.S.C. § 802(6) (defining a controlled substance to include any drug or substance "included in schedule I . . . of this part B of this subchapter."); CSA, 21 U.S.C. § 812(c), Schedule I at (c)(17). A bankruptcy trustee would need to yield to the government's interests in protecting the public's health, as expressed by the CSA.

The Court observes, without deciding, that it is quite possible that Medpoint's IP and the IP licensing revenues could be seized or forfeited, and that Medpoint could be or could have been guilty of facilitation of a crime under the CSA. *See* Deputy A.G. James M. Cole, U.S. DOJ, Memorandum at 2 (June 29, 2011) ("Persons who are in the business of cultivating, selling or distributing marijuana, and those who knowingly facilitate such activities, are in violation of the Controlled Substances Act, regardless of state law."). Both ANW and Medpoint could be or could have been guilty of violating the CSA under an accomplice theory of liability. *See* 18 U.S.C. § 2(a) (establishing aiding and abetting liability for crimes against the U.S.).

The Court finds that the prospects of a possible forfeiture or seizure of Medpoint's assets poses an unacceptable risk to a chapter 7 estate and to a chapter 7 trustee.[11] Other courts have dismissed cases for similar concerns regarding a trustee's potential risk exposure. *See In re Charles George Land Reclamation Trust*, 30 B.R. 918, 924 (Bankr. D. Mass. 1983) (dismissing a chapter 7 case for cause because neither a trustee nor the United States Trustee would take the case, due to the "potentially unlimited and untested liability standards of both the State and Federal Superfund statutes.").

Petitioning Creditors' argue that the Cromnibus Act essentially eliminates the risk of federal enforcement actions against medical marijuana operations. This argument aslo fails to sway the Court. That the Cromnibus Act prohibits the Department of Justice ("DOJ") from using that funding for enforcement against medical marijuana operations does not foreclose the possibility of enforcement. For example, in 2012, the DOJ's

---

[11] The Court declines to make a finding on the issue of whether Medpoint's assets (the IP, its licensing revenues, its interest in Tier, and claims against ANW and others) are or are not forfeitable/seizable under the CSA and/or other federal law. However, such an issue could very well be central to a bankruptcy court's decision in future cases in states which allow the production and sale of "medical marijuana." The same is true for the issue of the enforceability and seizability/forfeitability of contracts and negotiable instruments. *See* 21 U.S.C. § 881(a)(6) (providing that "negotiable instruments" used to facilitate any violation of the CSA are subject to forfeiture and that "no property right shall exist in them.").

Asset Forfeiture Program "recorded total net forfeiture deposits of $4.2 billion" via coordinated actions involving the FBI, ATF, DEA, and other law enforcement agencies. Dept. of Justice, Asset Forfeiture Program FY 2014 Performance Budget at 1. The Court cites this as an example of a possible non-Cromnibus Act source of funding for enforcement actions against medical marijuana businesses. The Attorney General can spend money from the DOJ's Asset Forfeiture Fund "to seize . . . property . . . pursuant to any law enforced or administered by the Department of Justice, or [for] any other necessary expense incident to the seizure . . . of such property . . ." 28 U.S.C. § 524(c)(1)(A). The Court takes this to mean that DOJ can use existing forfeiture proceeds to prosecute claims against Medpoint under the CSA (and seek forfeiture of Medpoint's assets) even though this year's budget allotment could not be used for such prosecution. The Court also notes that the Cromnibus Act only applies to funding through September 30, 2015. The next spending bill approved by Congress might not prohibit the DOJ from using its general funds to enforce the CSA against Arizona's medical marijuana businesses.

The Court will not enter an order for relief which would then result in the appointed chapter 7 trustee necessarily violating federal law (the CSA) in carrying out his or her duties under the Code. The dual risks of forfeiture of Medpoint's assets and a trustee's inevitable violation of the CSA in administration of a Medpoint chapter 7 estate constitute cause for this Court to dismiss Petitioning Creditors' involuntary Petition under section 707(a). The Court grants Medpoint's Motion.

### *2. Unclean Hands Doctrine*

The bankruptcy court is a court of equity. *Young v. United States*, 535 U.S. 43, 50, 122 S. Ct. 1036, 1041 (2002). "The 'unclean hands' defense applies to conduct immediately related to the cause in controversy." *In re Everett*, 364 B.R. 711, 723 (Bankr. D. Ariz. 2007) (citation omitted). "[B]ecause of the clean hands doctrine a

federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law." *See Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387, 64 S. Ct. 622, 624 (1944). "Under the 'clean hands' doctrine, one who does not come into equity with clean hands, and keep them clean, must be denied all relief, whatever may have been the merits of his claim." *Hall v. Wright*, 240 F.2d 787, 794–95 (9th Cir. 1957).

When Medpoint entered into the various agreements with Petitioning Creditors, it was very much in the business of managing and operating a medical marijuana business. Medpoint drained off ANW's cash so that ANW, a not-for-profit entity, would not hold an inordinate amount of cash. In effect, the profitability of ANW's business was usurped by Medpoint via the Medpoint Service Agreement and IP License Agreement. Medpoint's former wholly-owned subsidiary, Infinite Bloom, LLC, employed over 70 people to run and manage ANW's sales and cultivation.[12] Medpoint also hired consultants to help with the construction of a cultivation facility, and branded the cannabis products with the Bloom trademark. Medpoint still licenses that IP to BMF (via Bloom Industries) for ANW's use. Medpoint's IP surely provides value to BMF in the sale of ANW's marijuana products.

Petitioning Creditors knew or should have known that Medpoint's activities were illegal under federal law. Medpoint did not dupe them into entering the medical marijuana business. Danzer, Brown, and 7511 signed various loan or other documents which expressly stated that Medpoint was in the medical marijuana business and that, under federal law, the production, marketing and sale of marijuana was and remains illegal. *See, e.g.*, Motion at Ex. C: 7511 Loan at 1 (DE 34-3) ("Marijuana is designated as a Class One Controlled Substance by the US Federal Government and pursuant to Federal Law is not approved for sale or distribution in the State of Arizona . . . .").

---

[12] *See* note 8, *supra*.

Jensen signed his Consulting Agreement with Medpoint to help it construct a medical marijuana cultivation facility. All the Petitioning Creditors knew or should have known there were serious possible criminal ramifications to Medpoint's business relationships with ANW and with marijuana products. Petitioning Creditors nonetheless decided to contract with Medpoint to pursue potentially lucrative investments or lending profits, and/or consulting fees, none of which could be realized but for Medpoint's marijuana-related business affairs. The unclean hands defense arises from and applies to Petitioning Creditors' medical marijuana-related claims against Medpoint. Petitioning Creditors' hands are unclean and they cannot now seek relief from this Court.[13]

### *3. No Bad Faith*

Under sub-sections 303(i)(1) and (2), the Court may award Medpoint a judgment for its fees and/or costs associated with the successful Motion, or for proximate actual, and/or punitive damages resulting from a bad faith involuntary petition.

The Court makes bad faith determinations by factual findings, judging the facts against what a reasonable person would have done or believed. *See In re Wavelength*, 61 B.R. 614, 620 (9th Cir. BAP 1986). In doing so, the Court considers the totality of the circumstances. *Higgins v. Vortex Fishing Systems, Inc.*, 379 F.3d 701, 705 (9th Cir. 2004). In support of its request for a damages hearing, Medpoint alleges that Petitioning Creditors filed the Petition "for the purpose of seizing control of the medical marijuana license to permit continuing operations of a business that operates in clear violation of federal law." Motion at 11:22–24 (DE 34). Medpoint attaches a draft of a letter containing a settlement offer from Petitioning Creditors' counsel to ANW's board members. Motion at Ex. K: Pre-Litigation Demand (DE 34-11) ("Demand Letter").

---

[13] *Northbay*, an unpublished opinion, reached a similar conclusion regarding a marijuana entity in California, stating that: "While the sale of marijuana may be legal under certain circumstances in California, it is unquestionably illegal under federal law. Appellants' hands were unclean, as a matter of federal law." *Northbay Wellness Grp., Inc. v. Beyries*, No. C 11-06255 JSW, 2012 WL 4120409, at *4 (N.D. Cal. Sept. 18, 2012). California also allows the production and sale of medical marijuana.

The Demand Letter is unsigned, and Petitioning Creditors deny that they ever actually sent it.

Putting aside the question of the Demand Letter's admissibility under Federal Rule of Evidence 408, the Court finds that the Demand Letter is evidence of Petitioning Creditors' unclean hands but not of their bad faith. The Demand Letter is evidence that Petitioning Creditors were involved in the medical marijuana business. The Court declines to find that Petitioning Creditors acted in bad faith by preparing the Demand Letter.

The viability of an involuntary chapter 7 petition filed against a debtor on account of debts relating to state-licensed medical marijuana operations is a novel question of law in this District. The Court does not find that Petitioning Creditors' acted unreasonably in filing the Petition. The record shows that Medpoint is not and cannot meet its ongoing financial obligations to numerous creditors, in amount and number sufficient to justify an involuntary petition under section 303(b). The record before this Court does not contain facts to support a finding of Petitioning Creditors' bad faith. As the Ninth Circuit BAP has noted, "[n]ot every failed reason for filing an involuntary petition amounts to 'bad faith.'" *In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 257 (9th Cir. BAP 2007). Petitioning Creditors' unclean hands do not equate to a finding of their bad faith in this instance. Finding no bad faith, there is no need for a hearing on damages proximately caused by a filing that is not in bad faith.

**Conclusion**

Despite this Court's refusal to grant Petitioning Creditors' requested relief, they still have other options for pursuing recourse against Medpoint. They may well have state-law causes of action against Medpoint which might be enforced in state court. For example, at his deposition, Downing seemingly admitted that Medpoint defaulted on or breached various loan agreements and consulting agreements. The record also contains

facts which might support fraudulent transfer claims against Medpoint and/or BMF under Arizona fraudulent transfer laws. Granting Medpoint's Motion will not give it a windfall, because Petitioning Creditors still have the opportunity to pursue their claims to hold Medpoint accountable in state court.

Arizona law is in conflict with the CSA. Arizona has chosen not to enforce the CSA against businesses such as Medpoint. However, as a federal court, this Court must adhere to federal law. Neither the alleged lack of enforcement funding nor the apparent lack of political will to enforce the CSA alters the fact that a person engaged in marijuana related business activities in Arizona is in violation of federal law. Petitioning Creditors may themselves have also violated the CSA and attempted to profit from those violations. At a minimum, they come to this Court with unclean hands. The Court has neither the authority nor the will to enter an order for relief or endanger a trustee who might be assigned to administer drug tainted assets for the benefit of creditors who assumed the risk of doing business with an enterprise engaged in violations of federal law.

Accordingly,

**IT IS ORDERED** that Medpoint's Motion is granted, and the Petition is dismissed.

**IT IS FURTHER ORDERED** that Medpoint's request for a hearing on damages is denied, as the Court will not grant Medpoint fees, costs, or damages.

**DATED: April 6, 2015.**

*[signature: Daniel P. Collins]*

DANIEL P. COLLINS
CHIEF UNITED STATES BANKRUPTCY JUDGE

1 | COPY of the foregoing mailed by the BNC and/or sent by auto-generated mail to interested parties.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# MEDPOINT

**1.**



**2.**



**Key:**

ANW = Arizona Nature's Wellness, an Arizona corporation (Not For Profit)
Medpoint = Medpoint Management, LLC, an Arizona limited liability company (For Profit)
HIN = Here Is Now, LLC, an Arizona limited liability company (For Profit)
ANT = Ask Nice Twice, LLC, an Arizona limited liability company (For Profit)
Bloom Industries = Bloom IP Industries, LLC, a Delaware limited liability company (For Profit)
BMF = Bloom Master Fund I, LLC, a Delaware limited liability company (For Profit)
FHG = Future Health Group, LLC, a Nevada limited liability company